IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DELMA JACKSON,                       )
                                     )
            Plaintiff,               )
                                     )
      v.                             )     CIVIL ACTION NO. 5:12-CV-301(MTT)
                                     )
WARDEN CARL HUMPHREY et al.,         )
                                     )
            Defendants.              )
_____    )

## <u>ORDER</u>

The Defendants have moved for summary judgment (Doc. 67) in this First

Amendment retaliation lawsuit brought pursuant to 42 U.S.C. § 1983.[1]  The Plaintiff,

Delma Jackson, is married to Miguel Jackson, an inmate at the Georgia Diagnostic and

Classification Prison.  (Doc. 67-1, ¶ 1; Doc. 73, ¶ 1).  The Defendants are all employees

of the Georgia Department of Corrections ("DOC"):  Carl Humphrey is warden of the

prison; Randy Tillman is director of facilities for the DOC; and Timothy Ward is the

DOC's assistant commissioner.[2]  (Doc. 67-1, ¶¶ 2, 4, 6; Doc. 73, ¶¶ 2, 4, 6).  The

Plaintiff alleges the Defendants permanently terminated her ability to visit her husband

---

[1] The Plaintiff's second amended complaint also references – very generally – violations of legal rights established by the Georgia constitution.  (Doc. 63 at 2, 4).  However, the complaint does not identify any particular state constitutional right, and the Plaintiff has not actually stated any state constitutional claim.  At best, she suggests an attempt to vindicate state constitutional rights through § 1983.  (Doc. 63 at 2).  She cannot do this because, as discussed below, § 1983 does not itself create any substantive rights but only provides a remedy for deprivation of *federal* rights.  *See, e.g., Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002).

[2] The Plaintiff's second amended complaint (Doc. 63) does not specify the capacity in which the Defendants are named.  However, as state employees, the Defendants cannot be sued for damages in their official capacities because any recovery would be paid from state funds and the state is immune from suits for damages pursuant to the Eleventh Amendment.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985); *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1577 (11th Cir. 1994); *Zatler v. Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986).  Accordingly, damages against the Defendants are available only in their individual capacities.

because she publicly accused DOC officials of violating inmates' constitutional rights. (Doc. 63 at 2).  For the reasons that follow, the Defendants' motion is **GRANTED in part** and **DENIED in part**.

## I.  FACTS

Given the nature of the allegations, it is necessary to discuss the facts in some detail.

### A.  Miguel Jackson and life in the prison's SMU

In June 2012 Miguel Jackson was confined to cell 215 on the E Wing of the prison's Special Management Unit ("SMU") for maximum security inmates.  (Doc. 67-1, ¶ 9; Doc. 67-3, ¶¶ 3, 5; Doc. 73, ¶ 9).[3]  SMU operations are strictly regimented.  For example, at least two correctional officers are used when escorting an inmate from his cell.  No two inmates are permitted outside their cells in the common area at the same time, and if an inmate is released from his cell in one wing and taken to another part of the prison, no other cell door in that wing may be opened during that time.  (Doc. 67-10, ¶ 11).  Food service is also tightly controlled.  SMU inmates normally receive three meals Monday through Thursday and two meals Friday through Sunday.  Correctional officers deliver the meal tray directly to inmates' cells.  When distributing meals, officers cannot proceed to the next cell until the meal tray has been delivered and the flap on the cell door closed.  (Doc. 67-10, ¶ 14).

The SMU has its own medical unit staffed with nurses from 7 a.m. to 7 p.m. each weekday.  A swing shift of nurses dispenses medications on weekends.  (Doc. 67-3, ¶

---

[3] The SMU, a building separate from the rest of the prison facilities, is composed of six wings designated A Wing through F Wing.  Each wing houses 32 single-man cells.  (Doc. 67-3, ¶ 4; Doc. 67-10, ¶ 11).  The E Wing has upper and lower levels of cells with eight cells on each side. The 16 cells on the lower level are behind a Lexan barrier and are separated from the open area of E Wing by a corridor with locking doors.  (Doc. 67-3, ¶ 6).

24).  Under "normal circumstances," mental health counselors round through the E Wing at least once a week to assess inmates' mental health.  (Doc. 67-10, ¶ 13).

### B.  Inmates' right to refuse food

Pursuant to DOC Standard Operating Procedure ("SOP") VH47-0002, mentally competent inmates "have the right to refuse to eat or take in liquids."  (Doc. 67-3 at 26).  An inmate is deemed to be on a hunger strike when he has refused nine consecutive meals.  (Doc. 67-3, ¶ 8; Doc. 67-3 at 26).  The SOP requires that striking inmates be housed in a setting where refusal or consumption of food can be observed and documented.  Counselors and health care personnel are to make "every effort" to convince the prisoner to resume eating, and meals must be offered at regular times throughout the strike.  (Doc. 67-3, ¶ 8; Doc. 67-3 at 27).  The inmate's hydration and nutritional status is to be assessed twice weekly by medical professionals, and the inmate must be weighed daily.  After seven to ten days, a DOC physician may order the inmate transferred to another facility for 24-hour medical observation and response.  Lab work will be performed as needed, with refusals of any procedures documented in the inmate's health record.  Medical staff may force feed an inmate who loses decision-making capacity.  Once the inmate declares the strike over or starts taking food and is medically stable, officials may cease observing him.  (Doc. 67-3, ¶¶ 8-9; Doc. 67-3 at 28).

### C.  Miguel Jackson goes on strike

Miguel Jackson began refusing meals around June 10, 2012.  He was deemed to be on strike the next day.  (Doc. 67-3, ¶ 10; Doc. 67-14 at 41:12-20).  Other SMU inmates also began refusing meals at this time.  (Doc. 67-3, ¶ 10).  For several reasons,

the Defendants believed Miguel Jackson prompted these additional strikes.[4]  (Doc. 67-4 at 77:10-12; Doc. 67-14 at 42:5-12, 46:20-24, 66:15-21).

On June 13, Warden Humphrey instructed his staff to monitor the striking inmates daily.[5]  (Doc. 67-3, ¶ 10).  On June 15, Humphrey met personally with each inmate, including Miguel Jackson.  (Doc. 67-3, ¶ 11; Doc. 67-10, ¶ 8).  They had various complaints, but all were upset about their assignment to the SMU.  (Doc. 67-3, ¶ 11).  In a June 19 e-mail, Humphrey informed Tillman the inmates were on a hunger strike but were in good physical and mental health.  (Doc. 67-3, ¶ 12; Doc. 67-3 at 29).  Tillman forwarded that e-mail to Ward the same day.  (Doc. 67-3 at 29).

The Plaintiff visited Miguel Jackson at the SMU on June 23 and June 24.  (Doc. 67-10, ¶¶ 4, 6; Doc. 67-10 at 14, 17).  Miguel Jackson's mother, Janice Jackson, accompanied the Plaintiff on June 23.  (Doc. 67-10 at 14, 17).  Sometime that next week, Humphrey instructed his staff that visitation privileges for all inmates participating

---

[4] For example, Humphrey testified that Miguel Jackson told him he was the leader.  (Doc. 67-4 at 77:10-12).  Miguel Jackson, in his deposition, testified that he told other inmates he was refusing food.  He added that his nickname is "Chief" because he has "a lot of influence" on the other inmates.  (Doc. 67-14 at 42:5-12, 46:20-24, 66:15-21).  On the other hand, Miguel Jackson also said he has never referred to himself as a leader of the strike, and the Plaintiff disputes the Defendants' characterization.  (Doc. 67-14 at 65:8-24).  The Plaintiff contends the leader was another inmate who is referred to in an intelligence report as preparing to incite a hunger strike in F Wing.  (Doc. 67-3 at 35-36).  The evidence does not support this, however, because the Defendants did not get word that F Wing inmates were going to join the strike until June 28, well after Miguel Jackson and others on E Wing had started refusing food.  (Doc. 67-3, ¶¶ 19, 21; Doc. 67-3 at 35-36)

[5] Initially, inmates were taken each day to SMU medical to be weighed and to have their vital signs measured.  One of the two officers needed to escort each inmate had to be a member of the Correctional Emergency Response Team ("CERT").  The available CERT personnel consisted of one sergeant and four officers who were not all present at the facility at the same time.  (Doc. 67-10, ¶ 19).

in the hunger strike, other than attorney visits, were to be suspended.[6]  (Doc. 67-3, ¶ 18).  According to Humphrey, this was for safety and security reasons, to avoid compromising the inmates' health, and to control outside communication in an effort to contain the spread of the strike.  (Doc. 67-3, ¶ 18).  There is also evidence Tillman and Ward were aware at this time the Plaintiff had publicly criticized the DOC's treatment of her husband because the DOC's chief investigator, Bill King, e-mailed them a June 26 intelligence report about prisoner rights advocates and the Plaintiff's statements to media outlets.  (Doc. 50-1).

As of June 26, four of the original six inmates, including Miguel Jackson, remained on hunger strike, according to an e-mail from Humphrey to Tillman.  In the same e-mail, Humphrey relayed a report that a doctor had asked Miguel Jackson why he was not eating, and Jackson told the doctor he would find out if he watched the news Friday.[7]  (Doc. 67-3, ¶ 13; Doc. 67-3 at 30-31; Doc. 67-10, ¶ 9; Doc. 67-18, ¶¶ 5-6).  Also, according to Humphrey, Miguel Jackson on June 22 had stopped allowing his ketone levels to be measured, and on June 26 both he and another inmate refused measurements of their ketone or blood sugar levels.  (Doc. 67-3, ¶ 13; Doc. 67-3 at 30-31).  By June 27, Miguel Jackson and another inmate were refusing to go to SMU medical, and three additional inmates had started to refuse meals, according to the e-mail update Humphrey sent to Tillman that day.  (Doc. 67-3, ¶ 15; Doc. 67-3 at 32).  The next day, there were eight inmates on hunger strike, Miguel Jackson and another

---

[6] An e-mail to Defendant Humphrey from the DOC's ombudsman office indicates visitation was halted sometime prior to the morning of June 28.  (Doc. 48-7 at 1).

[7] Miguel Jackson denies the nurse's version of his comments, but he admits he may have told the doctor at some point to check the newspaper for the reasons he was striking.  (Doc. 67-14 at 194:15-24).  In any event, it is undisputed the nurse's version is what was reported to Humphrey.

inmate still refused to go to medical, and two more inmates were refusing to allow measurement of their blood sugar and ketone levels.  (Doc. 67-3, ¶ 19; Doc. 67-3 at 35-36).  The strike was intensifying and growing.

On June 28, Humphrey forwarded to Tillman a June 25 letter from the Plaintiff to Miguel Jackson that references a rally planned for June 29, the hunger strike, and the possibility that inmates at Augusta State Prison would be striking as well.[8]  (Doc. 67-3, ¶ 17; 67-3 at 33-34; 67-11 at 251:14-252:13, 253:12-15).  Ward received the letter in an intelligence report.  (Doc. 67-6, ¶ 4; Doc. 67-7 at 41:9-42:22).  This letter was a factor in Humphrey's decision to terminate the Plaintiff's visitation.  (Doc. 67-4 at 58:2-59:2).  It also was the source of his belief that the strike was spreading to other prisons. However, Humphrey did not check to see if the Plaintiff's claim was true, and he concedes he had no idea at the time the Plaintiff's visitation was revoked whether the strike had actually spread to Augusta.  (Doc. 67-4 at 56:9-25, 77:25-79:1, 178:17-179:6).  Similarly, it is not clear Tillman read the letter.  He admits he relied only on what he heard in his later meeting with the other Defendants when they discussed suspending the Plaintiff.  (Doc. 67-9 at 35:25-36:21).

On the afternoon of June 28, investigator King sent an e-mail to Tillman and Ward advising them that media websites indicated a rally would be held at the state Capitol the next day to show solidarity with striking prisoners.  Humphrey also received this information.  (Doc. 67-3, ¶ 20; Doc. 67-6, ¶ 5; Doc. 67-6 at 9).  King further indicated there were "unconfirmed reports" the hunger strike would expand to Augusta State Medical Prison and Macon State Prison, and he reported "talk" that inmates in the

---

[8] The letter had been intercepted by SMU staff.  (Doc. 67-3, ¶ 17).  Prison officials began opening and reading Miguel Jackson's mail "sometime along when the hunger strike started." (Doc. 67-4 at 56:23-57:8).

SMU's F Wing planned to join the strike.  (Doc. 67-3 at 36; Doc. 67-6, ¶ 5; Doc. 67-6 at 9).  Outside of the SMU, however, inmates did not actually join the strike because, according to Ward, intelligence reports indicated "there was no grassroots effort that was sustainable out there to do that."  (Doc. 67-7 at 124:22-125:1).

### D.  The Plaintiff's first rally at the Capitol

On Friday, June 29, the Plaintiff and 15 to 25 others held a public protest at the state Capitol.  (Doc. 67-6 at 11; Doc. 67-11 at 52:13-18).  The Plaintiff helped to organize the event.  (Doc. 67-11 at 52:19-21).  At the rally, the Plaintiff says she spoke about prison conditions and tried to build awareness about "what [the inmates] were enduring."[9]  (Doc. 67-11 at 67:10-15).  The DOC was also monitoring the rally through "intelligence assets" it had placed there.  According to an e-mail King sent to Tillman and Ward that afternoon, the rally's primary purpose "was to gain media attention in Georgia to the hunger strike."  (Doc. 67-6 at 11).  King also reported that another rally organizer, Kenneth Glasgow, received a phone call during the protest from someone purporting to be an Augusta State Medical Prison inmate participating in the strike.  (Doc. 67-6 at 11).

The following Monday, July 2, Humphrey moved the striking inmates to climate controlled cells on the lower level of E Wing.  Arrangements were made to provide nursing staff at the SMU 24 hours per day to supplement use of the full infirmary in the

---

[9] The conditions of confinement in the SMU at the Georgia Diagnostic and Classification Prison have received considerable attention by news outlets and are frequently the subject of lawsuits filed in this Court.  For example, there is currently pending before the Court ten consolidated cases by prisoners contesting their SMU confinement.  *See Gholston v. Humphrey*, No. 5:12-cv-97 (MTT) (filed Mar. 21, 2012).  Other prisoners have mounted legal challenges to their treatment in the SMU which, though not ultimately successful, have raised issues regarding conditions to which they were subjected that were sufficient to necessitate a trial.  *See, e.g.*, *Turner v. Upton*, No. 5:10-cv-502 (MTT) (filed Dec. 28, 2010).

main prison building.[10]  (Doc. 67-3, ¶ 23; Doc. 67-3 at 42).  On July 5, Deputy Warden of Security June Bishop reported to Humphrey that in addition to the eight inmates isolated in E Wing, two more inmates declared themselves on strike, and another was being moved to the first floor of E Wing after skipping his ninth meal.  (Doc. 67-3, ¶ 26).  In an effort to contain the strike, Humphrey met with each of the inmates on July 6.  (Doc. 67-3, ¶ 27).  At the end of the meetings, each inmate, including Miguel Jackson, accepted a sack lunch of three chocolate milks and three sandwiches.  (Doc. 67-1, ¶ 69; Doc. 73, ¶ 69).  Humphrey believed the inmates' acceptance of the sack lunches indicated the strike was over.  Bishop, who was present for the meetings, says she also believed the strike was over.[11]  (Doc. 67-3, ¶ 27; Doc. 67-10, ¶ 28).  Based on this belief, Humphrey restored visitation privileges for all of the inmates.  (Doc. 67-3, ¶ 27).  The Plaintiff visited Miguel Jackson that weekend, July 7 and 8.  (Doc. 67-10, ¶¶ 4-5; Doc. 67-10 at 15-16; Doc. 67-14 at 110:1-11).

### E.  The Plaintiff's second rally at the Capitol

On Monday, July 9, the Plaintiff spoke at another rally at the state Capitol.  (Doc. 67-4 at 8:6-14; Doc. 67-11 at 65:24-66:1).  That same day, Humphrey was informed that eight inmates had refused their breakfast, lunch, and dinner trays.  (Doc. 67-1, ¶ 82; Doc. 73, ¶ 82).  The group included Miguel Jackson and two others who had been part

---

[10] Specifically, four nurses normally assigned to the infirmary were sent to cover the SMU, and an infirmary physician was asked to be available in the SMU two days instead of one.  Agency nurses were then retained to replace the nurses transferred to the SMU.  (Doc. 67-3, ¶ 24).  The eight striking inmates were moved on July 2 to the lower range of E Wing without incident.  (Doc. 67-3 at 43).  Defendant Humphrey then ordered that they be visually checked by prison staff in 15 minute intervals.  (Doc. 67-10, ¶ 26).

[11] Miguel Jackson concedes he accepted the lunch but says he had no intention of eating it and later gave it away.  (Doc. 67-1, ¶ 70; Doc. 73, ¶ 70; Doc. 67-14 at 93:23-25).

of the strike since June 10.  (Doc. 67-3, ¶ 29).  Their visitation was once again suspended.  (Doc. 67-4 at 21:13-23).

On July 10, Bishop informed Humphrey that of the striking inmates, only Miguel Jackson had received visitors that weekend.  (Doc. 67-3, ¶ 30;[12] Doc. 67-3 at 46).  Humphrey sent an e-mail that same day to Tillman informing him the inmates were resuming their strike.  Humphrey included an Internet link to an *Atlanta Journal-Constitution* article about the Plaintiff's July 9 protest.  He also expressed his belief the protest "may be the reason the inmates continued the strike" and suggested the timing of the Plaintiff's weekend visit to Miguel Jackson was noteworthy.[13]  (Doc. 67-3, ¶ 31; Doc. 67-3 at 52; Doc. 67-4 at 9:14-10:17).  Also on July 10, a DOC employee who worked in public affairs forwarded a copy of the newspaper article to Tillman and Ward.  (Doc. 67-7 at 9:1-10:2; Doc. 67-8 at 4).  The Plaintiff is quoted in the article as speaking critically of the DOC's treatment of her husband and is characterized as the organizer of the protest.  (Doc. 67-8 at 4).

On July 12, a DOC investigations and compliance employee sent an e-mail containing video of the July 9 protest to Tillman and Ward.  Ward concedes he viewed the video at some point, though not using the link.  (Doc. 67-7 at 12:8-13:24; Doc. 67-8 at 5).  The same day, investigator King e-mailed Tillman and Ward about a recorded phone call inmate Dexter Shaw made July 12.  (Doc. 67-6, ¶ 9; Doc. 67-6 at 21; Doc. 67-19, ¶ 10; Doc. 67-19 at 8).  The e-mail characterized Shaw's call as revealing that the Plaintiff "has allegedly told [Miguel] Jackson to keep the hunger strike going for ten

---

[12] There are two paragraphs in this document numbered "30."  The citation is to the second such paragraph.

[13] Humphrey concedes he does not know specifically what the Plaintiff told Miguel Jackson during the weekend visit.  (Doc. 67-4 at 144:22-145:4).

more days until July 18" and that she did not want the inmates to come off the strike without written guarantees from the governor and DOC commissioner.[14]  (Doc. 67-6 at 21).

King sent Tillman and Ward an intelligence summary July 15 with links to two articles on the hunger strike.  He noted the one piece of new information they contained was the Plaintiff's statement that she would demand a meeting with DOC Commissioner Brian Owens and that demonstrators would not leave DOC headquarters until that happened.[15]  (Doc. 50-4 at 1).

### F.  The Plaintiff's third rally at DOC headquarters

On July 16, a Monday, the Plaintiff spoke at a public demonstration at the DOC's headquarters in Forsyth.  (Doc. 67-11 at 66:2-5).  On that occasion, she had banners with the names of the inmates who were on strike.  (Doc. 67-11 at 62:7-10, 64:25-65:17).  Humphrey, Tillman, and Ward happened to be at headquarters for a meeting about an upcoming execution, but, prompted in part by the protest outside, they also talked about the hunger strike.  (Doc. 67-3, ¶ 35).  They all knew the Plaintiff was participating and that the demonstration was in support of the inmates on strike.  (Doc. 67-1, ¶ 103; Doc. 67-3, ¶ 35).  They also believed the Plaintiff had verbally threatened

---

[14] Although the Defendants have submitted recordings of these telephone calls to the Court, they state it was this intelligence report of the phone calls' content, rather than the actual recordings, that they relied on at the time of their decision.  (Doc. 83 at 13 n.9).

[15]  During this time, Humphrey continued to receive daily reports about the striking inmates.  He perceived the strike to be growing.  Bishop also advised him additional inmates had announced their intent to join the strike.  (Doc. 67-3, ¶¶ 32, 33; Doc. 67-3 at 54-56).  This included inmates in B Wing who had seen reports of the strike on the news.  (Doc. 67-17 at 61:18-63:21).  By July 16, all eight striking inmates were refusing to go to the SMU medical unit to have their physical condition assessed.  (Doc. 67-3, ¶ 34).

that "their protests would escalate" if Commissioner Owens did not meet with the group. (Doc. 15-1, ¶ 19; Doc. 48-8 at 8).

Around the time of the meeting, another DOC official e-mailed Ward and Tillman a copy of an *Atlanta Journal-Constitution* article about the protest taking place at DOC headquarters.  Ward read the e-mail containing the article.  (Doc. 67-7 at 15:20-16:22; Doc. 67-8 at 7-8).  Humphrey also admits reading the article but says he doesn't know when he read it.  (Doc. 67-4 at 16:3-17).  In the article, the Plaintiff is quoted as listing inmate grievances and accusing the DOC of being deceptive and trying to conceal the hunger strike.  She also demands Commissioner Owens call Humphrey to "tell him to follow…prison regulations by the book" and "make the warden enforce standard operating procedure."  (Doc. 67-8 at 7-8).

Ward was not pleased by the presence of the Plaintiff and her fellow demonstrators at DOC headquarters.  As he candidly testified in his deposition, two of the factors that played a role in the decision to terminate the Plaintiff's visitation was her demand for a meeting with Commissioner Owens and her public demonstrations.  (Doc. 67-7 at 136:10-16).  Ward further stated:

> Like I said, the intelligence piece when she made the comment that the Commissioner – making the demand that the Commissioner sit down and speak to her.  That was one of the factors from the intelligence piece – from our intelligence piece that also went in to the determinative factor to remove her from visitation….That that demand after you come uninvited without a – without a permit to assemble, after you've been told to leave and they still stay and then coupled with that statement about demand to see the Commissioner, that's one of the things that factor, yeah.

(Doc. 67-7 at 136:3-9, 19-24).[16]  The next day, July 17, the Plaintiff faxed a letter to Commissioner Owens complaining that Humphrey and other officials were not responding to their concerns about prison conditions and the hunger strikers.  (Doc. 50-6).  Owens concedes he may have read the letter that day, but cannot recall.  (Doc. 74 at 38:13-22).

On the afternoon of July 18, the Defendants again attended a meeting at DOC headquarters.  The purpose was to discuss the same execution they had discussed previously, which had been scheduled but then stayed.  At the end of the meeting, they discussed the hunger strike and Humphrey's plans for dealing with it.  Some of what they discussed included what Humphrey perceived as a correlation between the Plaintiff's visits to Miguel Jackson and Miguel Jackson's ability to lead other inmates and assert influence inside and outside the prison.[17]  They then discussed the possibility of restricting Miguel Jackson's visitation privileges with the Plaintiff to control the spread of the strike, and ultimately, both Humphrey and Tillman recommended to Ward that the Plaintiff's visitation be terminated.  (Doc. 67-3, ¶ 38; Doc. 67-7 at 122:5-18; Doc. 67-9 at 21:14-23).

Following their recommendations, Ward instructed Humphrey to revoke Jackson's visitation privileges with the Plaintiff.  (Doc. 67-3, ¶ 39; Doc. 67-7 at 122:5-15).  Humphrey is not aware of any additional information Ward based his decision

---

[16] Although Ward may have been personally offended by the Plaintiff's statements, there is no indication that the protest at DOC headquarters was conducted in an unlawful manner or that its participants were cited for illegal conduct.

[17] Also that afternoon, a DOC official sent Ward a link to an article published by *Black Agenda Report* that described the demonstration at DOC headquarters and featured a picture of the Plaintiff protesting with a bullhorn.  (Doc. 50-15).  It is not clear whether Ward viewed this e-mail before or after deciding that day to terminate the Plaintiff's visitation.

upon other than what Humphrey had previously provided to him.  (Doc. 67-4 at 117:23-118:2).  One of the main reasons Tillman says he agreed with Ward's decision was the timing between the Plaintiff's visits on July 7 and July 8 and Miguel Jackson's refusal of food on July 9.[18]  (Doc. 67-9 at 28:9-16).

### G.  The Plaintiff's visitation is terminated and remains terminated

The next morning, July 19, Humphrey instructed his staff to prepare letters to Miguel Jackson and the Plaintiff informing them their visitation was revoked.  The letters do not indicate the duration of or reason for the revocation.[19]  (Doc. 48-11; Doc. 67-3, ¶ 40; Doc. 67-5 at 28-29).  The letters were sent even though visitation for all of the striking inmates, including Miguel Jackson, had already been cut off.  (Doc. 67-4 at 21:13-23; Doc. 67-7 at 99:15-20).  Miguel Jackson continued to strike until July 26, 2012, when he requested his tray of food and ended his strike.  (Doc. 67-3, ¶ 43).  The suspension of the Plaintiff's visitation privileges remains in place.

According to Humphrey, he and Ward were motivated to revoke the Plaintiff's visitation "by the correlation between [the Plaintiff's] visits with [Miguel Jackson] and his continued participation and instigation of the hunger strike."  (Doc. 15-1, ¶ 24; Doc. 67-3, ¶ 48; Doc. 67-4 at 115:21-116:4).  Humphrey maintained that the strike was "significantly disrupting the operation of the facility and jeopardizing the security and

---

[18] Tillman argues his role in the Plaintiff's suspension was limited to receiving and relaying the information provided by Humphrey, agreeing with Humphrey's assessment of the situation as discussed at the meeting, and supporting Ward's decision to revoke the Plaintiff's visitation. (Doc. 67-2 at 29).

[19] This violates the Rules and Regulations of the State of Georgia, as well as DOC SOP IIBO1-0005, which require that such notifications inform the visitor of the reason and length of time for which their privileges are revoked.  (Doc. 48-9 at 10; Ga. Comp. Rules & Regs. 125-3-4-.03).

safety of staff and inmates."[20]  (Doc. 67-3, ¶ 48).  Ward, as noted above, concedes the

Plaintiff's demonstrations and request for a meeting with Commissioner Owens were

among the factors that prompted him to act.  But he also says he told Humphrey to

remove the Plaintiff from the visitation list because of her influence on the hunger strike

and intelligence that revealed she was encouraging her husband to continue to

participate in the strike.[21]  (Doc. 67-7 at 95:2-25).

      The Plaintiff, of course, contends the Defendants based their decision on her

speech.  She bases this argument partly on their own sworn statements.  For example,

she focuses on Ward's testimony that the Plaintiff "was providing a platform for [Miguel

Jackson] to continue his disruptive behavior in our system.  I don't need her to provide a

platform for him to do that."  (Doc. 67-7 at 156:8-11).  Ward suggested that to regain her

visitation, the Plaintiff would need to ensure she did not give Miguel Jackson a platform

to be disruptive, as before when "she was kind of the one that was the lightning rod

getting communication – getting – not per se – getting information out for him to

continue that behavior."  (Doc. 67-7 at 117:3-11).  Ward specifically referred to the

Plaintiff facilitating phone calls and "organization of things" to get Miguel Jackson's

message out, "or…putting people together to facilitate him doing that."  (Doc. 67-7 at

117:12-15).  "If you read, like I said, in the intelligence report I guess there was those

---

[20] But he has also admitted the inmates' refusal to eat did not compromise security.  (Doc. 67-4 at 51:13-17).  Rather, the "disturbance" occurred because inmates were encouraging other inmates to exercise their right to refuse food.  As more and more inmates stopped eating, additional medical personnel were needed to more closely monitor their health pursuant to the DOC's obligation under its hunger strike policy.  That in turn required a shifting of medical resources from other parts of the prison.  (Doc. 67-4 at 46:19-47:1, 48:8-49:21, 51:6-11).

[21] Like Humphrey, Ward agrees the SMU was able to maintain adequate security coverage during the strike.  (Doc. 67-7 at 164:12-165:1).  "Only thing we had to do was increase staffing," he says, because most of the potential logistical problems were eliminated by moving all of the striking inmates to cells behind the Lexan barrier in E Wing.  (Doc. 67-7 at 167:4-5, 168:2-22).

different organizations and different things and groups of those nature" who were "voicing their opinions about the conditions I guess."  (Doc. 67-7 at 117:19-25).  To Ward, the Plaintiff was the "conduit" or "avenue" through which Miguel Jackson was "able to communicate disruptive actions and behaviors to incite others either inside or outside."  (Doc. 67-7 at 120:17-121:7, 141:3-13).  "That was the link as far as the outside as far as encouraging that behavior.  Once we restricted her visitation, the disruptive behavior that they were displaying stopped….The platform for them to get the encouragement to continue that disruptive behavior was cut off once she stopped visiting."  (Doc. 67-7 at 100:5-8, 13-15).

In an early affidavit, Humphrey also suggested he was considering events happening outside the prison's walls.  He declared that "[i]n light of statements attributed to [the Plaintiff] that the protest efforts would escalate if Commissioner Owens did not meet with them, we were concerned that she would continue to encourage [Miguel Jackson's] decision to continue to the disruption to the operation of the prison to support the protest effort."  (Doc. 15-1, ¶ 24).[22]  Humphrey cannot now recall how he found out about the statements he attributes to the Plaintiff or what these statements specifically were.  (Doc. 67-4 at 35:5-36:1).  James McMillan, the SMU unit manager, says he was not aware of an act the Plaintiff did to coerce inmates into participating in

---

[22] This early affidavit was filed with the Defendants' response to the Plaintiff's motion for a preliminary injunction in December 2012.  The Plaintiff finds it significant that Humphrey's statement regarding his concerns about escalating protests was not included in his more recent affidavit supporting the Defendants' motion for summary judgment.  The Plaintiff also points out that Humphrey recharacterizes his role in the decision-making process.  In his first affidavit, Humphrey describes what "*we* were motivated by" in making the decision.  (Doc. 15-1, ¶ 24).  In his second affidavit, Humphrey refers instead to the fact that he was in "agreement with the decision" that Ward made.  (Doc. 67-3, ¶ 48).

the hunger strike "[o]ther than trying to shed light on or bring attention to the hunger

strike through contacting the media and things."  (Doc. 75 at 25:16-22).

### H.  Subsequent proceedings

The Plaintiff filed suit July 26, 2012 against Warden Humphrey seeking damages

and injunctive relief to restore her visitation privileges.  (Doc. 1).  The Court denied her

request for a preliminary injunction but indicated its intent to set the case down for an

early trial with expedited discovery.[23]  (Doc. 23).  The Plaintiff then decided to engage in

additional discovery and eventually filed her second amended complaint, adding

Defendants Ward and Tillman and omitting her claim for injunctive relief.[24]  (Doc. 63).

The Defendants moved for summary judgment on July 22, 2013.  (Doc. 67).

## II.  DISCUSSION

### A.  Summary judgment standard

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

the evidence presented, "a reasonable jury could return a verdict for the nonmoving

party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Info. Sys. &*

*Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002).  The movant

---

[23] Unfortunately, disposition of this case has been anything but expeditious.  There seems to have developed a contest of wills between the Parties or their counsel.  That neither side wants to be seen as capitulating to the other may explain why some 90 docket entries have been made thus far or why the Court has been called to manage several needless disputes along the way.  This also may explain why the Parties lost sight of the key issue:  Why has the visitation ban remained in place long after the professed justification for the ban has vanished?

[24] It is not clear whether the Plaintiff intended to delete her claim for injunctive relief, as the opening paragraph of her second amended complaint references "emergency injunctive relief." (Doc. 63 at 1).  However, she removed this form of relief from her enumerated counts where she had requested it previously.  If the Plaintiff still desires that the Court restore her visitation, she would need to amend her complaint yet again.

must cite "to particular parts of materials in the record, including depositions,
documents, electronically stored information, affidavits or declarations, stipulations
(including those made for purposes of the motion only), admissions, interrogatory
answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

     The burden then shifts to the non-moving party, who must rebut the movant's
showing "by producing…relevant and admissible evidence beyond the pleadings."
*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011)
(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The non-moving party
does not satisfy its burden "if the rebuttal evidence is merely colorable, or is not
significantly probative of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).
However, "credibility determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not those of a judge. … The
evidence of the non-movant is to be believed, and all justifiable inferences are to be
drawn in [its] favor."  *Anderson*, 477 U.S. at 255.

### B. The Defendants are entitled to qualified immunity for their actions during the period of disturbance created by the hunger strike

Pursuant to 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be
> liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress.

Section 1983 does not create any protected rights itself, but instead provides a remedy
for constitutional violations committed under color of state law.  The relevant inquiry

under § 1983 is whether a right secured by the United States Constitution has been violated.

The First Amendment provides that Congress shall make no law abridging the freedom of speech or the right of people to peaceably assemble or petition the Government for a redress of grievances.  U.S. Const. amend. I.  To establish a First Amendment retaliation claim and prove a constitutional violation, "a plaintiff must show that (1) her speech was constitutionally protected; (2) she suffered adverse conduct that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there was a causal relationship between the adverse conduct and the protected speech."  *Castle v. Appalachian Technical Coll.*, 631 F.3d 1194, 1197 (11th Cir. 2011) (citing *Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)).  To establish a causal connection, a plaintiff must demonstrate the defendants were subjectively motivated to take the adverse action because of the protected speech.  *Id.* (citing *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008)).  If the plaintiff can do that, the burden shifts to the defendants, who may avoid liability and prevail on summary judgment by showing they would have taken the same action in the absence of the plaintiff's conduct.  *Id.* (citing *Mosley*, 532 F.3d at 1278).  *See also Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Moton v. Cowart*, 631 F.3d 1337, 1342 (11th Cir. 2011).

Even if a constitutional violation has occurred, however, the Defendants may still receive the benefit of qualified immunity.  "'Qualified immunity offers complete protection for individual public officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013) (quoting *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir.2012)).  "'[T]o obtain qualified immunity, an official must first establish that he acted within his discretionary authority.'"  *Id.* (quoting *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir.2013)).  Because there is no question the Defendants in this case acted within their discretionary authority, it is the Plaintiff's burden to show that (1) Humphrey, Tillman, and Ward violated her constitutional rights, and (2) "'that the right involved was 'clearly established' at the time of the putative misconduct.'"  *Id.* (quoting *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir.2012)).  The Court may exercise its "'sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.'"  *Id.* (quoting *Loftus*, 690 F.3d at 1204).  In this case, the Court will first address the "clearly established" prong.

Whether a constitutional violation is clearly established is determined "'in light of the specific context of the case, not as a broad general proposition.'"  *Id.* (quoting *Terrell*, 668 F.3d at 1250).  "'The relevant, dispositive inquiry … is whether it would be *clear* to a reasonable [state official] that his conduct was unlawful in the situation he confronted.'"  *Id.* (quoting *Loftus*, 690 F.3d at 1204).  This requires that the Court look to law decided by the Supreme Court of the United States, the Eleventh Circuit, and the Supreme Court of Georgia and determine whether the state of the law as elucidated by those courts gave the Defendants fair warning that their revocation of the Plaintiff's visitation privileges under the circumstances of this case was unconstitutional.  *Id.* (citing *Vinyard v. Wilson*, 311 F.3d 1188, 1194 (11th Cir. 2002)).

The Plaintiff "must 'demonstrate that the contours of the right were clearly established in [one of three] ways.'" *Id.* (quoting *Loftus*, 690 F.3d at 1204).  First, if judicial precedents in an area are tied to particular facts, the Plaintiff must "'show that a materially similar case has already been decided.'"  *Id.*  Second, if judicial precedents are not tied to particular facts, the Plaintiff may "'point to a broader, clearly established principle [that] should control the novel facts [of the] situation.'"  *Id.*  "To succeed under this approach, 'the principle must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'"  *Id.* "Third, in a narrow category of matters, 'the conduct involved in the case may so obviously violate [ ] th[e] constitution that prior case law is unnecessary.'"  *Id.* at 1346.

The specific question, at least initially, posed by the facts of this case is whether it was clearly established that during a prison hunger strike among maximum security inmates, a reasonable prison administrator could not revoke the visitation privileges of an inmate's wife who he believed was using her prison access to encourage or prolong the strike if he acted, in part, out of hostility toward her protected speech.  *See Foy v. Holston*, 94 F.3d 1528, 1536 (11th Cir. 1996).  In addressing this question, the "proper analysis of [the Defendants'] entitlement to qualified immunity is not whether they knew that terminating [the Plaintiff's visitation] in retaliation for protected speech was lawful, but rather whether [terminating her visitation] based upon all the information available to them at the time, to include any knowledge of [her] protected speech, was objectively reasonable."  *Sherrod v. Johnson*, 667 F.3d 1359, 1364 (11th Cir. 2012).  The objective reasonableness of a defendant's conduct is measured by reference to clearly

established law and shields defendants from suit for their constitutional violations provided they reasonably, albeit mistakenly, could have believed their conduct to be lawful. *See Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1294 (11th Cir. 2000).

Of course, the Eleventh Circuit and the Supreme Court of the United States "have long held that state officials may not retaliate against private citizens because of the exercise of their First Amendment rights." *Bennett*, 423 F.3d at 1255. But this broad proposition does not itself provide clearly established law sufficient to place the Defendants on notice that their conduct in the specific circumstances of this case was unlawful. After all, the law may permit state officials to retaliate against private citizens exercising their First Amendment rights *if* the officials can establish that, in addition to any retaliatory motive, they also had a lawful reason for their conduct. *See Sherrod*, 667 F.3d at 1363 (citing *Mt. Healthy*, 429 U.S. at 286-87). Consequently, at the summary judgment stage, evidence of mixed motives in a case where discriminatory intent is an element of the underlying constitutional tort clouds the question of whether the state officials acted lawfully or unlawfully.[25] *See Foy*, 94 F.3d at 1534. The lack of clarity as to the constitutionality of his behavior can in turn render the official's action objectively reasonable at the time it was done because the official would not be on

---

[25] The Defendants, relying on *Sherrod*, truncate their qualified immunity analysis into a simple mixed-motive analysis. This is understandable, because *Sherrod* itself is somewhat conclusory in its consideration of mixed motives and qualified immunity. But it likely would be a mistake to conclude from *Sherrod* that the Eleventh Circuit has fashioned a mixed-motive test for qualified immunity. Prior case law in this Circuit, including *Foy* and *Stanley*, on which *Sherrod* depends, makes clear that there is not a separate mixed-motive test as might be found in, say, a Title VII case. Rather, these prior cases relied on traditional qualified immunity principles and simply held that government officials are not likely to be on notice of the illegality of their behavior when they have both lawful and unlawful motivations for their actions.

Moreover, there is a real danger for the Defendants when they place all their eggs in a mixed-motive analysis. They basically concede evidence of an unlawful motive but contend their lawful motive entitles them to qualified immunity. That is fine so long as they have lawful motives, but, as discussed below, they have advanced no lawful motive for the *continued* denial of visitation long after the end of the hunger strike.

notice of the potential illegality of his conduct.  *See id.*  Thus, when the record establishes the official was motivated in part by lawful considerations, qualified immunity is available.  *Stanley*, 219 F.3d at 1296.  Here, indisputable evidence shows (a) there was a lawful basis for reasonable prison officials to have terminated the Plaintiff's visitation during the hunger strike, and (b) the Defendants were motivated, *at least in part*, by that lawful basis.  *Stanley*, 219 F.3d at 1296-97 & n.29.

The Defendants concede the Plaintiff engaged in protected speech when she participated in protests challenging prison conditions and spoke critically of the prison's management in published news reports.  (Doc. 67-2 at 19).  They also admit they were aware of her activity and concede for the sake of argument this suggests a retaliatory motive on their part.  (Doc. 67-2 at 20).  However, they claim they also had a proper reason for terminating the Plaintiff's visitation:  She was instigating or encouraging continuation of the hunger strike.  They base this on (1) the timing of her June 23 and June 24 weekend visits and Miguel Jackson's statement to medical staff later that week to watch the news Friday to find out why he was not eating; (2) the confiscated letter from the Plaintiff to her husband in which she mentions a rally planned for Friday [June 29], the hunger strike, and the possibility that inmates at Augusta State Prison would be striking as well; (3) the June 28 intelligence reports provided by investigator King regarding the June 29 protest and concerns the strike was spreading within the SMU and to other prisons; (4) the timing of Miguel Jackson's July 6 announcement he was ending the hunger strike, the Plaintiff's July 7 and July 8 visits with her husband, and Miguel Jackson's resumption of the strike on July 9, the same day the Plaintiff held her second rally at the state Capitol; and (5) the report from investigator King that a

recorded phone call revealed inmate Dexter Shaw telling another party the Plaintiff had instructed her husband to keep the strike going for ten more days.

A reasonable prison administrator, when confronted with these facts, could believe the Plaintiff was helping to perpetuate the hunger strike and that her ability to visit her husband was enabling her to do this.  This is a lawful justification for terminating the Plaintiff's ability to visit her husband.  The strike was disruptive to normal prison operations, created an additional burden on prison resources, and there were legitimate concerns that the strike could spread outside the SMU and even to other prisons.  In short, prison officials could reasonably conclude the interactions between the Plaintiff and Miguel Jackson posed significant implications for the order and security of their facility, and they would be justified in responding as the Defendants did here. *See Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals" of prison administration). The Court is particularly sensitive to the Defendants' judgment on this matter given "the 'inordinately difficult undertaking' that is modern prison administration." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (quoting *Turner v. Safley*, 482 U.S. 78, 85 (1987)). Courts give "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Id.* at 408.

Additionally, the record also establishes indisputably that the Defendants were actually motivated, at least in part, by these lawful considerations.  *Stanley*, 219 F.3d at 1296.  It is clear they had evidence of and believed the Plaintiff was influencing the strike.  Humphrey connected the Plaintiff to the activity inside the prison as early as

June 28 when he sent Tillman the Plaintiff's letter to Miguel Jackson discussing the planned June 29 rally, the hunger strike, and the possibility that Augusta State Prison inmates would be striking as well.  (Doc. 67-3, ¶ 17; 67-3 at 33-34).  On June 28, investigator King's e-mail to Tillman and Ward described the Plaintiff's June 29 rally as an expression of solidarity with striking prisoners.  Humphrey also received this information.  (Doc. 67-3, ¶ 20; Doc. 67-6, ¶ 5; Doc. 67-6 at 9).  On July 10, only two days after the Plaintiff visited her husband, Humphrey sent the e-mail to Tillman informing him the inmates were resuming their strike, expressing his belief the July 9 protest "may be the reason the inmates continued the strike" and that it was "also worth noting that Miguel Jackson received a visit from his wife…this weekend."  (Doc. 67-3, ¶ 31; Doc. 67-3 at 52; Doc. 67-4 at 9:14-10:17).

   The Plaintiff argues that evidence the Defendants were even partly motivated by these lawful considerations is in dispute.  (Doc. 72 at 41).  But she does not point to specific facts in the record that support this contention.[26]  At most, she appears to try to undermine the Defendants' knowledge prior to her suspension, implying they crafted

---

[26] The Plaintiff has made it difficult for the Court to determine the facts that are actually in dispute in this case.  Her response (Doc. 73) to the Defendants' statement of material facts (Doc. 67-1) consists less of citations to particular materials in the record supporting a dispute and more of argumentative objections to how she anticipates the Defendants will use those facts.   Adding to the confusion, the Plaintiff filed "Record Citations" (Doc. 73-1, Doc. 76-1) in support of her response to the Defendants' statement of material facts.  Whether this document, featuring a semi-narrative argument intermixed with record citations, was intended to also serve as the Plaintiff's statement of material facts is unclear.  In any event, it did not comply with this Court's requirement that respondents to summary judgment motions "attach…a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried."  M.D. Ga. L.R. 56.  And these documents led to the later filing of the mysteriously-titled "Plaintiff's Reply to Defendants' Response and Objections to Plaintiff's Corrected Record Citations in Support of Plaintiff's Response to Defendants' Statement of Material Facts as to Which There is No Genuine Issue to be Tried," a 135-page monstrosity the true necessity of which is unclear to the Court.  (Doc. 86).

   Nevertheless, the Court has tried to ferret out the actual facts in dispute.  But to the extent it has been unable to do so, the Defendants' statement of material facts are deemed admitted by the Plaintiff.  *See* Fed. R. Civ. P. 56(c), 56(e); M.D. Ga. L.R. 56.

their lawful reasons after the fact.  For example, she argues the letter forwarded June

28 did not truly play a role in the Defendants' decision because "Ward read it of late,

Humphrey did not particularly remember reading it, and Tillman admitted he did not rely

on anything outside of the July 18, 2012 meeting to recommend" the Plaintiff's visitation

be suspended.  (Doc. 72 at 42).  But it is mere conjecture to suggest that because

Humphrey or Ward later testified they cannot remember exactly when they first read the

letter, or because Tillman may have relied on what Humphrey or Ward said rather than

the letter itself, that it did not play a role in their decision.  Further, given the date on

which the letter was confiscated and transmitted from Humphrey to Tillman and Ward,

and given Humphrey's e-mail description of the letter as "referencing the hunger strike

and the possibility [Augusta State Medical Prison] will participate," there is no evidence

to dispute that the Defendants understood the substance of the document as early as

June 28 and prior to the Plaintiff's suspension.  (Doc. 67-3 at 33-34).

Beyond that, the Plaintiff's arguments as to any factual dispute involving the

Defendants' motivation miss the mark in the context of qualified immunity analysis.

Although there may be a dispute on the underlying constitutional claim as to whether

the Defendants would have suspended the Plaintiff totally absent her protected speech,

there is indisputable evidence that, even given her speech, the Defendants terminated

the Plaintiff's visitation because they believed her access to Miguel Jackson was

enabling her to instigate, spread, or prolong the strike inside the prison.  *See Stanley*,

219 F.3d at 1297.

While there is evidence the Defendants were at least partly motivated by lawful

reasons, the Plaintiff has not presented any precedent, and the Court has found none,

to suggest that reasonable prison administrators armed with this knowledge would know it was a violation of clearly established law to revoke the Plaintiff's visitation privileges during the strike even if they also intended to punish her for engaging in protected speech.  That is, under these circumstances, there was no authority to firmly direct the Defendants that, because they also possessed an unlawful motive, they could not act on their lawful motive.  Thus, their conduct was objectively reasonable.  That there may be a triable issue as to the existence of an unlawful motive for the Defendants' actions is unimportant for qualified immunity analysis:  "'Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and preexisting law does not dictate that the merits of the case must be decided in plaintiff's favor, the [Defendants are] entitled to immunity.'"  *Sherrod*, 667 F.3d at 1364 (quoting *Foy*, 94 F.3d at 1535).

Accordingly, the Defendants are protected by qualified immunity for their actions during the period of time surrounding the hunger strike.  To this extent, they are entitled to summary judgment.

### C. The Defendants are not entitled to qualified immunity or summary judgment for the time period following the hunger strike

The hunger strike ended when Miguel Jackson began eating again on July 26, 2012.  At some point after that, the threat of any strike-related disruption disappeared.  However, the Plaintiff remains barred from visiting Miguel Jackson despite the passage of more than a year since her privileges were revoked and the strike ended, and the Defendants have presented no cognizable explanation for this.[27]  During oral argument,

---

[27] During their depositions, the Defendants generally suggest the Plaintiff's ability to regain her visitation privileges is contingent upon either her and/or Miguel Jackson's good behavior, though

one of the Plaintiff's lawyers, who apparently had not been actively involved in the case before then, made a common sense point:  If the Defendants had restored the Plaintiff's visitation rights after the strike ended, this lawsuit would never have been filed.  (Doc. 90 at 29:14-21).  As the Parties engaged in their contentious discovery, or their "contest of wills" as the Court has put it, it seems they lost sight of this obvious fact. Consequently, the Plaintiff's visitation ban continued for no reason apparent in the record.

It is clear that once the disturbance caused by the hunger strike ended, the threat the Defendants believed the Plaintiff posed to prison operations also diminished.  As Warden Humphrey testified during his deposition:

> Q.   Then answer me this:  You suspended or you terminated – I'm sorry; you suspended [the Plaintiff's] visitation as of July 9th.  You then went on to terminate her visitation on July 19th.  What's today's date, Warden Humphrey?
> A.   February the 17th, 18th?  I'm not sure.
> Q.   February 18th, 2012.  Why haven't you given Delma Jackson back her visitation?
> A.   I think that she -- because she was involved in or assisted in instigating a disturbance in a prison.
> Q.   Now – but everyone else got their visitation back; right?
> A.   Yes.

---

it is not clear what that entails.  *See, e.g.*, Dep. Humphrey, Doc. 67-4 at 148:9-14, 152:22-153:3 ("I – I don't – I can't give you a specific behavior.  I think that that's just one of those things that – that we'll have to review and look and see what her actions are, see what his actions are, and make a determination at – at a later given date.  I don't have a specific date in mind."); Dep. Ward, Doc. 67-7 at 116:22-24, 120:21-24 ("[I]f she is ever added back, she needs to make sure she is not influencing [Miguel Jackson] to be disruptive in the system…She has to ensure that she's going to follow the rules of visitation.  Also not be a conduit for [Miguel Jackson] to exhibit disruptive behavior as he has done in the past.").  At oral argument, counsel for the Defendants offered a similar excuse, adding that Miguel Jackson had not properly completed necessary paperwork – which he was not provided until September 2013.  The Court does not find these reasons availing.  There simply is no substantive evidence the Court has seen in the record or the Defendants' briefs to support the Plaintiff's indefinite suspension.

Q.   Have you had any evidence from the time you terminated Ms.
Jackson's visitation to present, that she's still trying to so-called create a
disturbance?

…

[A.]  No.

…

Q.   Do you have any reason to believe that [she's still trying to so-called
create a disturbance]?

A.   No.

(Doc. 67-4 at 95:4-96:5).

Thus, the Defendants' asserted lawful basis for banning the Plaintiff's visitation

during the hunger strike vanished once the strike, and any related disruption,

concluded.  This leads to a somewhat unusual situation.[28]  The Defendants concede the

Plaintiff engaged in protected speech and suffered an adverse response likely to deter a

person of ordinary firmness.  And they do not deny that there is some evidence of

unlawful motivation behind their decision to terminate the Plaintiff's visitation.  Their sole

argument is that they were also motivated by legitimate concerns that the Plaintiff was

fomenting the hunger strike.  But that justification for their action has ceased to exist,

and they have not advanced a lawful motive for keeping the Plaintiff's visitation ban in

place.  Clearly, a reasonable jury could infer that the Defendants continued to deny the

Plaintiff access to the prison after the strike ended solely to maintain her silence, to

punish her for publicly criticizing prison conditions, to serve as an example to other

inmates' families of the consequences of publicly criticizing prison officials,[29] or in

---

[28] Yet it is a situation entirely of the Defendants' own creation.  By relying on a mixed-motive
argument and more or less conceding evidence of an unlawful motivation, they have boxed
themselves in once their lawful reason for acting disappears.

[29] This is of particular concern to the Court.  Issues related to conditions inside the SMU are
broader than those affecting only this Plaintiff.  Justified or not, there has been plenty of criticism
of how SMU inmates are treated.  *See supra* note 9.  If the Defendants decided to make an

retaliation for filing this lawsuit.[30]  Certainly, this Court cannot hold as a matter of law that the Defendants have a lawful reason to continue the visitation ban when the Defendants have not even said what that reason is.  In short, there is no basis in the record for the Court to conclude the Defendants are entitled to qualified immunity from the Plaintiff's claim that they continued to retaliate for her protected speech long after the hunger strike and any threat it posed had ended.[31]

Without the shield of qualified immunity, summary judgment is not available to the Defendants for the period of time following the end of the hunger strike disruption.  As noted above, the Plaintiff has put forward evidence of a prima facie case for First Amendment retaliation during this time frame, and the Defendants have not rebutted it.

example of the Plaintiff by permanently suspending her visitation privileges because they did not like what she had to say about their prison and its administration, they have not only retaliated against her but have moved to chill the speech of others who are concerned about the manner in which prisoners are housed in the SMU.  As the Plaintiff's counsel stated at oral argument: "It's not just what it did to Ms. Jackson, [it's] what it does to all protests all over the state.  If you think something is wrong in the prison system, you're going to remember Delma Jackson: Delma Jackson got her visitation taken away because she spoke up.  That's what's going to be sent out there as the message."  (Doc. 90 at 30:9-14).

[30] The law is "clearly established…that retaliation against private citizens for exercising their First Amendment rights [is] actionable."  *Bennett*, 423 F.3d at 1255.  Even this general principle would inform an objectively reasonable prison administrator he could not refuse to restore the Plaintiff's visitation *solely* for the reasons suggested above.  Broad statements of principle not tied to particularized facts can still clearly establish law applicable to different facts when the principle is set forth "with obvious clarity…so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted."  *Terrell*, 668 F.3d at 1256 (quoting *Vinyard*, 311 F.3d at 1351) (internal quotation marks removed).  Importantly, an official is *not* protected by qualified immunity merely because "'the very action in question' has not been held unlawful before."  *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

[31] Granted, a trial may reveal lawful reasons for the Defendants' post-strike conduct or additional circumstances in which it would not be clear to reasonable officials in the Defendants' position that their conduct was unlawful, and the Defendants may reassert their qualified immunity defense at trial following the Plaintiff's presentation of her case.  But the record at this juncture simply does not support a qualified immunity finding for the Defendants' actions – or inactions – after the strike.

There is a genuine factual dispute as to the Defendants' subjective motivation for their actions that must be resolved by a jury.[32]

### III. CONCLUSION

The Defendants' motion for summary judgment is **GRANTED** to the extent that they are entitled to qualified immunity for the period the Plaintiff's visitation was suspended during the hunger strike.  The Defendants are not entitled to qualified immunity for the period after the strike ended and the threat of disruption subsided.  Because there is a genuine dispute as to the facts supporting the Defendants' conduct during this time, their motion for summary judgment as to this period is **DENIED**.

**SO ORDERED,** this 8th day of January, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[32] A jury will also need to resolve whether one, some, all, or none of the Defendants are liable based on their individual roles in prolonging the suspension of the Plaintiff's visitation.  *See Iqbal*, 556 U.S. at 677 ("Absent vicarious liability, each Government official, his…title notwithstanding, is only liable for his…own misconduct.").  The record shows the Defendants shifting responsibility among one another.  For example, Humphrey testifies that the decision to restore the Plaintiff's visitation belongs to Ward and Tillman, and he disclaims any role in the process.  (Doc. 67-4 at 154:3-8).  At the same time, Ward says he has not acted because the issue has not risen to his level yet.  (Doc. 67-7 at 150:22-151:8).  He is waiting on Humphrey and Tillman to advise him: "[A]ny decision that's made[,] it's going to take the recommendation from the warden, recommendation from the facilities director[,] and then I will come up with my conclusion."  (Doc. 67-7 at 154:12-15).  If the Plaintiff were to prevail, a jury will need to determine which of the Defendants is actually responsible for her injuries.